# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARY ANN ROJEK,

        Plaintiff,

                                    Case No. 08-14492

v.                                   Hon. Gerald E. Rosen

CATHOLIC CHARITIES OF
JACKSON, INC.

        Defendant.

_____ /


## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ May 27, 2010 _____

PRESENT: Honorable Gerald E. Rosen
                     Chief Judge, United States District Court


## I.  INTRODUCTION

Plaintiff Mary Ann Rojek, a blind social worker, commenced this action in this

Court on October 22, 2008, alleging that Defendant Catholic Charities of Jackson, Inc.

discriminated against her on account of her disability by failing to grant her interviews in

the hiring process for two jobs: a clinical director position and a clinical therapist

position.  She asserts these claims pursuant to the Americans with Disability Act of 1990

(ADA), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et*

*seq.*  Plaintiff timely invoked and fully exhausted all administrative remedies applicable

to this action. The Equal Employment Opportunities Commission (EEOC) issued her a right-to-sue letter, which she received on or about July 25, 2008.

Presently pending before the Court are cross-motions filed by the parties, in which each side seeks an award of summary judgment in its favor on Plaintiff's claims. In support of her motion, Plaintiff argues: (i) that she is disabled under federal disability law; (ii) that she is qualified to perform the requirements of both the clinical director and the clinical therapist jobs that she desired, with or without reasonable accommodation; (iii) that she was denied opportunities to engage in an informal, interactive process about reasonable accommodations for her disability; and (iv) that she was unlawfully denied interviews on the basis of disability. Defendant argues: (i) that it had legitimate, non-discriminatory reasons for hiring another applicant for the clinical director position; (ii) that Plaintiff is not qualified for the clinical therapist position since she cannot safely perform an essential function of the job—home visits—with or without reasonable accommodation; and (iii) that no reasonable accommodations exist to enable Plaintiff to properly and safely perform this essential function.

These cross-motions have been fully briefed by the parties. Having reviewed the motions, briefs, and accompanying exhibits, as well as the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' cross-motions "on the briefs." <u>See</u> Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on these motions.

## II. FACTS

### A.    The Parties

Plaintiff Mary Ann Rojek has been blind since birth.  She has a condition called retinopathy of prematurity.  She has minimal light perception, but otherwise cannot see. She is a licensed social worker and generally regarded as having solid work experience as a therapist.  Plaintiff earned a bachelor's degree from Michigan State University and a master's degree from the University of Michigan, both in social work, with honors.  She is a member of the Academy of Certified Social Workers (ACSW) and has a credential as a certified addictions counselor, level I.  She has been working in the field of social work since at least 1984, including experience in treating behavioral health, substance abuse, sexual assault and domestic violence issues.  She has worked in individual, group, couple's and family therapy treatment settings.  Early in her career, Plaintiff also performed some home visits as a caseworker for a juvenile diversion program in Jackson, Michigan.  Between 1997 and 2005, she worked for Integro, a private for-profit mental health agency, as an outpatient therapist.  Integro laid Plaintiff off in Fall 2005, only to hire her back several weeks later in an administrative capacity as a quality manager.  She testified that in her current capacity at Integro she oversees one other staff member, among other responsibilities.

In December 2005, Plaintiff applied for work with Defendant Catholic Charities of Jackson, Inc. (CCJ).  CCJ is an outpatient mental health agency located in Jackson, Michigan.  The agency receives federal financial assistance in the form of Medicare and Medicaid payments.  In addition to various clinical services that it provides, CCJ is under

3

contract with the Michigan Department of Human Services (DHS) to provide outpatient therapy to referred clients.  Some of these referrals involve home-based therapy (home visits) for children and families where DHS has substantiated claims of child abuse or neglect.  The contract that governs the DHS-CCJ relationship provides that each case referred to CCJ must be assigned to a therapist or counselor who is appropriately degreed, licensed and supervised.  The therapist or counselor must meet with the referred client within ten working days of receipt of the referral and submit a report to DHS within 30 days of an initial interview.  At the time of the events in this case, CCJ had a backlog of referrals from DHS.  Many of the therapists at CCJ were either part-time or independent contractors.  Some CCJ therapists refused to do home visits or certain types of group therapy.

**B.     The Clinical Director Position**

In late 2005, CCJ placed a job announcement in several state and local newspapers for a clinical director position, after the out-going director resigned.  The job announcement described the position as follows:

Clinical Director

Job Description
Responsible for overseeing the clinical services of a non-profit behavioral health program including batter intervention services.  Experience with various age groups, individual, group and family therapy.  Prefer candidates with experience in domestic violence and substance abuse.  Opportunities include: administration, program and community development, grant writing and public relations.

Qualifications
- LMSW, ACSW
- Five (5) years supervisory/management experience

- Willing to accept and work by Catholic social teachings

(Pl. Mot. for Summ. J., Ex. 3.)  Plaintiff learned of the position through the newspaper ad and submitted her resume and cover letter on December 14, 2005.

Vicky Schultz, Executive Director for CCJ at the time, reviewed applications and selected four candidates to interview including Plaintiff.  Ms. Schultz conducted the initial interviews herself.  After the first meeting, Ms. Schultz invited three of the four candidates to participate in second-round interviews with the entire clinical staff. Plaintiff was not selected for a second interview.  The three applicants that were selected included Susan Guerriero, Michelle Liska, and Barb Martin, none of whom are disabled.

Ms. Schultz did not know that Plaintiff was blind prior to interviewing her. She stated in her deposition that she was surprised to learn about Plaintiff's blindness, because it made her think about "how that person goes about doing the different aspects of the job."  (Pl. Mot. for Summ. J., Ex. 4, Schultz Dep. 36:2-5.) For example, she wondered how Plaintiff reviewed charts, signed off on documents, carried files around an office and up stairs, and traveled to out-of-office meetings.  Ms. Schultz testified that she was concerned about whether Plaintiff could fill in for last minute meetings that Ms. Schultz could not personally attend.  She was also concerned that Plaintiff would not command the respect of the staff because of her blindness.  She said, "Thinking of all the details of what the job would encompass, I think sight would be important to gain that respect from staff."  (Schultz Dep. 46:7-13.)  During the interview with Plaintiff, Ms. Schultz raised some of these concerns.  Plaintiff explained that she required

special software for reading documents and that she arranged for personal transportation to and from meetings. Ms. Schultz never raised her other concerns—those about Plaintiff's ability to fill in at the last minute or to command respect from the staff—before making the decision not to call Plaintiff back for another interview. (Schultz Dep. 51:7-24.)

Ms. Schultz stated that, although she considered Plaintiff's blindness a possible concern, it alone was not the basis of her decision not to grant Plaintiff a second interview: "I think that I was looking for the whole package with a lot of qualifications, a lot of different pieces of it. [Plaintiff's blindness] doesn't stand alone by itself." (Schultz Dep. 46:7-25.) There appears to be no question that Plaintiff had relevant educational background and work experience as a social worker in her application materials. [1] Rather, when questioned directly about her decision, Ms. Schultz testified that certain key attributes or types of experience were missing:

Q: What was Ms. Rojek lacking, in your view?

A: A name that was well known in the community since I was not from the community. Contacts in the community of potential donors. A

---

[1] For example, Adrienne Rowland, who currently serves as the clinical director at CCJ and reviewed Plaintiff's resume for purposes of this lawsuit, testified that she would have liked to interview her along with the three candidates because Plaintiff's background and experience were comparable to the three individuals that Ms. Schultz selected for the second round. Ms. Rowland started her tenure at CCJ in 2003 as a student intern, then moved into a clinical therapist position after earning a master's degree in social work from the University of Michigan in 2004. In this lawsuit, she serves as CCJ's 30(b)(6) deponent and testified to the hiring process for both the clinical director position and the clinical therapist position, discussed *infra*. Ms. Rowland participated in the second round of the hiring process for the clinical director position as a member of the clinic staff. (Pl. Mot. for Summ. J., Ex. 10, Rowland Dep. 37:16-39:1.)

bubbly, outgoing personality that I see connects well with staff, donors, funders, sort of charisma, I would say.

Q:     And you felt that Ms. Rojek didn't have those particular qualities?

A:     Correct.

Q:     And you believe that the other three individuals did have those qualities; is that fair to say?

A:     At least two of them, yes.[2]

       . . .

Q:     So at this time period, what was your understanding of the experience that Ms. Rojek did have?

A:     She had the credentials.  She had solid work experience.  I'd have to look at her resume here.  I don't remember that she had the supervisory experience. . . . And a lot of her experience in her recent years was with specifically the CMH agencies.  CMH, either the provider or CMH themselves, which is called Lifeways.  They were all somewhat connected, and you'd have to go back further into her employment history before you would find someone outside of that CMH system.

(Schultz Dep. 47:23-48:6, 49:3-15.)

Ultimately, after completing the second round of interviews with the three other candidates, Ms. Schultz offered the clinical director job to Susan Guerriero.  Ms. Schultz stated that Ms. Guerriero possessed the requisite managerial and supervisory skills, across different types of social work settings.  For example, Ms. Guerriero had previously

---

[2]  Barb Martin was offered a second interview even though Ms. Schultz admitted that she was not necessarily a superior candidate to Plaintiff and lacked connections to the community, which Ms. Schultz explained was an important job qualification.  "[Ms. Martin] has those qualities as far as outgoing and personable and the charisma and everything else.  But she did not live in Jackson County and hers was sort of a courtesy interview."  (Schultz Dep. 48:15-18.)  Ms. Schultz testified that she offered Ms. Martin a second interview because she had worked with her in the past.

served as a social worker in private practice, as well as director of social work in a hospital for twelve years.  Ms. Schultz also testified that she felt Ms. Guerriero had a bubbly and outgoing personality, and a base in the community.

According to Plaintiff, Ms. Schultz called her in January 2006 to tell her that she was not being offered the clinical director job.  Ms. Schultz allegedly told Plaintiff that the reason she was not being hired for the position was because of Ms. Schultz's concern about whether Plaintiff could attend meetings, especially on short notice.  Plaintiff did not recall Ms. Schultz mentioning any other reasons for not being offered the job, including any comments about Plaintiff's experience, or lack of experience, relative to other candidates.  Ms. Schultz encouraged Plaintiff to apply for the clinical therapist positions should they become available.  In a letter dated February 3, 2010, Ms. Schultz formally informed Plaintiff that she had not been hired for the clinical director job.

## C.      The Clinical Therapist Position

In the spring of 2006, three clinical therapist positions came open at CCJ.  The job posting for the clinical therapist job stated:

> QUALIFICATIONS:  Completion of a Masters Degree in Social Work, Psychology, Guidance and Counseling, or a closely related field.  Current state certification and/or license are required. Prefer candidates with special training or certification, such as the ACSW or CAC. . . .

> NATURE OF WORK:  Employees in this class perform professional level work in the field of mental/behavioral health assessment, treatment, and prevention work.  Employees in this class will interview clients; provide therapy to persons of all ages and/or their families in individual, family, conjoint, and group sessions.  Employees in this class will additionally present educational programming as needed, assist in the preparation of reports, and will maintain all related paperwork.  This work is confidential and requires a high degree of independent judgment.

(Pl. Mot. for Summ. J. Ex. 7.)  A more detailed job description stated that clinical therapist responsibilities include: "the coordination of treatment with other agencies" and compliance with "all agency policies and procedures."  Although neither the job posting nor the more detailed description mentioned home visits, Susan Guerriero, at that time the new clinical director at CCJ, testified that home visits were also a job requirement.  (Pl. Mot. for Summ. J., Ex. 9, Guerriero Dep. 21:21-25.)  Plaintiff submitted her resume and a cover letter on April 11, 2006.

Ms. Guerriero handled the clinical therapist hiring process herself, though she discussed her recommendations with Ms. Schultz and solicited feedback from the staff before extending offers of employment.  Ms. Guerriero did not select Plaintiff to be interviewed for the therapist positions.  She knew Plaintiff professionally prior to receiving Plaintiff's application materials.  They volunteered together in the 1970s and later, when Ms. Guerriero was director of social work at Foote Hospital, she interviewed Plaintiff for a position, but did not extend an offer.  Nevertheless, Ms. Guerriero opted not to interview Plaintiff because she did not feel that Plaintiff could fill the various staffing needs of the agency at that time:

Q:     Why did you not interview her?

A:     I had a number of different needs at the agency.  I needed – there were a number of different job assignments that I needed people [sic] who could be pulled and assigned to a variety of different kinds of cases.  Out-reach visits for the Department of Human Resources were one area.  There may be a need to train people working domestic violence groups.  Sometimes I was stuck and had to fill in myself for sex offender groups.  And I was trying to find people that could be moved into any area that I needed.

Q:      . . . Presumably you came to the conclusion that Ms. Rojek wouldn't fill those needs, is that correct?

A:      Mary Ann Rojek has always had a very good reputation as a clinical therapist.  That's been my understanding.

Q:      Okay.

A:      The difficulty that I had at that time was that I needed a person who, if they were out in a home where there had been a substantiated child abuse complaint, the referral was brought to our agency, I needed somebody that could go out and visually observe interactions between parents and children. . . .  I needed someone who could report if there were [sic] poor hygiene, if there were bruises, or how children acted in front of their parents or by themselves.  I needed a person who could be tough enough to work with aggressive men. . . .

(Guerriero Dep. 35:18-36:25.)  Ms. Guerriero further articulated general safety concerns that therapists face, though she did not specify what particular risks she thought Plaintiff might face due to her blindness.  Finally, she admitted that Plaintiff's blindness was the basis for her decision not to interview her:

Q:      Would you agree with me, Ms. Guerriero, if Ms. Rojek were not blind, and you didn't have knowledge of Mrs. Schultz' sentiments regarding Ms. Rojek, and her questions about whether Ms. Rojek could perform the clinical director job as a blind individual, based on her resume, education, years of experience, if she weren't blind, is it likely you would have interviewed her for the position?

        . . .

A:      The question is whether or not I would have interviewed her?

Q:      Correct.

A:      Yes, probably.

Q:      And do you believe she would have been a strong candidate for the clinical therapist position?

A:      I don't know that.

(Guerriero Dep. 53:14-54:6.)  Ms. Guerriero admitted that she never discussed her concerns with Plaintiff and that "in hindsight, [she] probably should have invited [Plaintiff] in for an interview" to determine whether the job was a "good fit."  (Guerriero Dep. 85:1-7.)  She nevertheless testified that even if she had interviewed Plaintiff, she believes that the ultimate result—not extending an offer of employment—would have been the same based on her belief that Plaintiff could not safely or properly complete home visits.  Eventually, Ms. Guerriero hired three non-disabled candidates—Delia Johnson, Sandra Corbin, and Vicky Lewis—who she admitted had comparable or lesser educational credentials than Plaintiff.[3]

## D.    Home Visits

State law requires therapists to report suspicions that child abuse or neglect is present in a home.  Mich. Comp. Laws § 722.623.   Therapists must make an immediate oral report of such suspicions, by telephone or otherwise.  They must then submit a written report within 72 hours, including a description of the abuse or neglect.  Therapists do not make a determination that abuse is in fact present.  Rather, they report their suspicions to the State of Michigan Department of Child Protective Services (CPS), which makes the ultimate determination about whether abuse is occurring.

---

[3] As with the clinical director position, Adrienne Rowland also testified that, based on a review of Plaintiff's application materials, it appeared Plaintiff's experience was comparable to or better than the interviewed applicants' experience for the clinical therapist position.  She further testified that she had concerns about how Plaintiff might go about performing some of her duties, particularly home visits, but stated that she would have liked to talk to Plaintiff first or discuss the issue with an experience blind social worker before making a determination.

CCJ retained two expert witnesses to evaluate whether visual observation during home visits is an essential function of a therapist's job and to provide background on the nature of home visits in the context of the DHS-CCJ relationship. These experts are Shannon Lowder, a clinical psychologist and licensed social worker, and Joye Sharpe, a former Children's Protective Services worker. In reports prepared for this case, both Dr. Lowder and Ms. Sharpe conclude that a blind social worker should not conduct outreach therapy services to the population served by CCJ through the DHS contract. They report that such visits raise serious safety concerns and that a blind social worker lacks the ability to observe and report, if necessary, critical details about home conditions and the physical conditions of the occupants. For example, Ms. Sharpe reports that "sight is necessary for observation in order to provide what is in the best interest of children and families. . . . Visual observation of the family dynamics, interactions and spontaneous or unplanned actions is a necessary component of the time spent with these families." (Def. Mot. for Summ. J., Ex. G, p. 5.) Dr. Lowder further testified at deposition that she felt "it would be impossible to observe certain things including bruises, marks, animals that are loose, alcohol bottles, drugs laying out, broken items that weren't broken the week before, such as a television screen . . . . that sort of thing." (Def. Mot. for Summ. J., Ex. F, Lowder Dep. 28:2-7.) Ms. Rowland and Ms. Guerriero similarly testified that they believed that sight is crucial to safely and effectively performing home visits. (Guerriero Dep. 94:1-6; Rowland Dep. 66:5-16.) None of CCJ's witnesses, expert and non-expert, have any training, education or experience with blindness.[4]

_____

[4] In support of her response brief, Plaintiff submitted a declaration of David Stayer,

## III. ANALYSIS

### A.    Standards Applicable to the Parties' Cross-Motions for Summary Judgment

Through the present motions, each party seeks summary judgment in its favor on Plaintiffs' two pending claims.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In addition, where a moving party seeks an award of summary judgment in its favor on an issue as to which it bears the burden of proof, this party's "showing must be sufficient for the court to hold that no

---

President of the Human Services Division at the National Federation of the Blind and a blind social worker, as a "rebuttal expert."  Defendant challenges the admissibility of Mr. Stayer's declaration because Plaintiff failed to disclose him as an expert witness under the terms of the Court's Scheduling Order.  The Scheduling Order provides: "No witness, expert or non-expert, may be called for trial unless that witness's name is listed by the respective dates set forth herein without order of the Court upon showing that the witness sought could not . . . reasonably have been listed as of this date."  (Dkt. # 10.)  Plaintiff's preliminary witness list did not name David Stayer, but instead reserved the right to call "any and all necessary rebuttal witnesses."  (Dkt. # 26.)  Plaintiff's final witness list named David Strayer as a "rebuttal expert."  (Dkt. # 28.)  However, under the express terms of the Scheduling Order, expert witnesses must be listed by the due date set for the preliminary witness list, fourteen days before discovery cut-off.  (Dkt. # 10.)  Accordingly, Plaintiff failed to disclose Mr. Stayer as an expert witness and Mr. Stayer's declaration is not properly before the Court.

reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. Pack v. Damon Corp., 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." Pack, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.    *Prima Facie* Cases and Burdens of Proof Under the ADA and the Rehabilitation Act**

The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

42 U.S.C. § 12112(a) (2008).[5]   A plaintiff bringing a discrimination claim under the

ADA must demonstrate a *prima facie* case.  Monette v. Electronic Data Sys. Corp., 90

F.3d 1173, 1178 (6th Cir. 1996).  Claims brought pursuant to the Rehabilitation Act are

analyzed in essentially the same way as ADA claims.  29 U.S.C. § 794; see also

Thompson v. Williamson County, 219 F.3d 555, 557 n.3 (6th Cir. 2000) ("Because the

ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act, see

42 U.S.C. § 12133, claims brought under both statutes may be analyzed together.").[6]

A *prima facie* case of disability discrimination under the ADA requires proof that:

(1) the plaintiff has a disability; (2) he or she is otherwise qualified to perform the job's

requirements, with or without reasonable accommodation; and (3) he or she was

discriminated against solely because of the disability.  Williams v. London Utility

Comm'n, 375 F.3d 424, 428 (6th Cir. 2004).  When a plaintiff alleges that he or she is the

victim of discriminatory treatment, he or she may establish a *prima facie* case with direct

---

[5]   Substantive amendments were made to the ADA and became effective January 1,
2009.  Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  However,
these amendments do not apply retroactively and this Court must decide this case using
the law in force at the time the complained of activity occurred.  See Milholland v.
Sumner County Bd. of Educ., 569 F.3d 562, 567 (6th Cir. 2009).

[6]   Section 504 of the Rehabilitation Act of 1973 states, in pertinent part: "No otherwise
qualified individual with a disability in the United States . . . shall, solely by reason of her
disability, be excluded from the participation in, be denied the benefits of, or be subjected
to discrimination under any program or activity receiving Federal financial assistance."
29 U.S.C. § 794(a).  Thus, under the Act, a plaintiff must make an additional showing
that that the relevant program receives federal financial assistance.  Sandison v. Michigan
High School Athletic Ass'n, Inc., 64 F.3d 1026, 1030-31 (6th Cir. 1995).  Here, the
parties do not dispute that CCJ received federal financial assistance and is accordingly
subject to the Rehabilitation Act.  Analysis of Plaintiff's claims under the Rehabilitation
Act are therefore merged with her ADA claims.

evidence, or he or she may establish a *prima facie* case with indirect evidence and proceed under the familiar McDonnell Douglas burden-shifting approach generally applicable in other types of workplace discrimination suits.  Macy v. Hopkins County School Bd. of Educ., 484 F.3d 357, 364 (6th Cir. 2007) (citing Monette, 90 F.3d at 1186-87); see also Hamlin v. Charter Twp. of Flint Fire Dept., 942 F. Supp. 1129, 1136 (E.D. Mich. 1996).[7]

> **1.** **The Monette Approach Controls the Instant Matter Because Plaintiff Has Submitted Direct Evidence of Discrimination.**

When an employer admits (or the evidence establishes) that it relied upon the plaintiff's disability in making its employment decision, direct evidence of discrimination exists.  Monette, 90 F.3d at 1180.  In such cases, application of the McDonnell-Douglas burden-shifting framework is inappropriate.  Id.  Instead,

> The only question left for resolution . . . is whether the adverse employment decision was based solely on the employee's disability. This question is resolved by answering what is most often the disputed issue in cases in which the employer has relied on the employee's disability to make the employment decision; whether the employee is otherwise qualified, with or without reasonable accommodation, to perform the essential functions of the job.

Id.

In this case, the evidence establishes that CCJ relied on Plaintiff's disability when it decided, first, not to grant her a second interview for the clinical director position and, second, not to grant her an initial interview for the clinical therapist position.  For the clinical director position, Ms. Schultz acknowledged that

---

[7]  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 1824-25 (1973).

Plaintiff's blindness was at least one factor in her decision not to call Plaintiff back

for a second interview with the entire clinic staff.  Plaintiff also submitted her own

deposition testimony about the January 2006 phone conversation she had with Ms.

Schultz, in which Ms. Schultz explained that the reason Plaintiff was not given the

job was because of her inability to get to meetings quickly.  The decision was

therefore necessarily linked to Plaintiff's blindness, insofar as that disability was

perceived as an impediment to filling in quickly for Ms. Schultz at meetings or in

other last-minute situations.  With respect to the clinical therapist position, there is

ample evidence, including Ms. Guerriero's direct testimony, that but for Plaintiff's

blindness she would have been granted an interview.  Thus, at this stage, the Court

will follow the <u>Monette</u> approach and need not apply the burden-shifting

framework.

      **2.**     **The Burden of Proof Shifts to the Defendant to Show that a Challenged Job Requirement is an Essential Function of the Job or That a Proposed Reasonable Accommodation Imposes Undue Hardship.**

In a direct evidence case the plaintiff bears the initial burden of establishing that

he or she is "disabled."  <u>Monette</u>, 90 F.3d at 1186.  The plaintiff also bears the burden of

establishing that he or she is "otherwise qualified" for the position despite his or her

disability: a) without accommodation from the employer; b) with an alleged "essential"

job requirement eliminated; or c) with a proposed reasonable accommodation.  <u>Id.</u>

However, *the employer* will bear the burden of proving by a preponderance of the

evidence that a challenged job requirement is essential, and therefore a business

necessity, or that a proposed accommodation will impose an undue hardship upon the

employer.  Id.[8]  The burden of persuasion also shifts to the employer on the essential

function and undue hardship of proposed accommodation issues.  See Hamlin v. Charter

Twp. of Flint Fire Dept., 165 F.3d 426, 431 (6th Cir. 1999) (citing Monette, 90 F. 3d at

1184).[9]

**C.     Plaintiff Fails to Establish That She is "Otherwise Qualified" for the Clinical Director Position.**

Plaintiff first claims that CCJ illegally denied her a second interview for the

clinical director position because of her blindness, in violation of both the ADA and the

Rehabilitation Act.  She argues that she had at least comparable qualifications to the three

individuals who went on for second interviews with the entire clinic staff and that Ms.

Schultz's concerns about Plaintiff's blindness were the real reason behind the decision

not to further interview her.  Finally, she argues that she was refused an interactive

process to discuss reasonable accommodations.  CCJ counters that Plaintiff was not

granted a second interview because she lacked the credentials and demeanor sought for

the direction position, regardless of accommodation.  The Court finds CCJ's argument

well-taken.

---

[8]  When an employee seeks a reasonable accommodation, he or she must establish that a "reasonable" accommodation is possible, and bears a traditional burden of proof that he or she is qualified for the position with such reasonable accommodation.  If the plaintiff establishes that a reasonable accommodation is possible, the employer bears the burden of proving that such reasonable accommodation would impose an undue hardship. Monette, 90 F.3d at 1186 n.12.

[9]  This Court has noted the significant problems inherent in the shifting of the burden of persuasion to the defendant employer, as it "effectively turns on its head the burden of proof in an ADA case."  See Hamlin, 942 F. Supp. At 1137-38.  Nevertheless, Monette remains controlling law in the Sixth Circuit and the Court must apply that law.  See Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d 719, 724 (6th Cir. 2000).

In this case, the parties do not dispute that Plaintiff has a covered disability. Rather, the sole issue before the Court is whether Plaintiff is otherwise qualified, with or without reasonable accommodation, to perform the essential functions of the job. Federal regulations define a "qualified individual with a disability" under the ADA as "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). Here, the Court need not reach the second prong—whether Plaintiff can perform essential functions, with or without reasonable accommodations—since Plaintiff cannot show that she had the requisite skill, experience, education and other job-related requirements of the clinical director job.

The clinical director job sought a candidate with a minimum of five years supervisory or management experience to be responsible for oversight of the clinical staff. The job description described the candidate sought as preferably someone who had experience with all age groups, and possibly someone who could take on administrative, community development, grant writing and public relations duties. Finally, Ms. Schultz, who was handled the hiring process, testified that she also wanted a candidate with an upbeat and strong personality. Plaintiff claims that she has "clearly demonstrated her qualifications [for the clinical director] through experience and education including a background of working with all ages and groups," (Pl. Resp. to Def.'s Mot. for Summ. J. at 20). The Court finds that the record does not support Plaintiff's assertion.

A review of Plaintiff's resume indicates that her supervisory or management experience was very limited. Plaintiff asserted that her work as interim director of an AWARE emergency counseling center satisfied the supervisory/management job qualification, but the work experience referenced was over twenty years old. Plaintiff also claimed broadly that she has more recent experience supervising staff, graduate students and volunteers, but the record indicates that *that* experience was also relatively limited, for example to one staff member, not a therapist. While there is no question that Plaintiff has a distinguished career as a therapist and possesses ample educational credentials in social work, notes from an interview questionnaire indicated that Plaintiff admitted that she lacked experience working with small children. In addition, Plaintiff has submitted no evidence to suggest any experience in community development and grant-writing work—both criteria listed in the job description.[10] Finally, Ms. Schultz testified that Plaintiff did not have the strong, outgoing, upbeat personality that she sought in a clinical director. Apart from Plaintiff's resume and her own testimony, the only remaining countervailing evidence is the testimony of Ms. Rowland, who stated that she would have liked to interview Plaintiff based on a review of her application materials. Ms. Rowland, however, never met Plaintiff and her testimony bears little weight in evaluating whether Plaintiff had the right demeanor for the clinical director job. Whether

---

[10]  Plaintiff points out that Ms. Guerriero did not recall discussing community development or grant-writing in her interview for the clinical director job—suggesting that experience in those fields was not *actually* a job requirement. However, Ms. Schultz testified more than once that she was seeking a candidate with strong ties to the Jackson community and that Ms. Guerriero's ties satisfied that requirement. Therefore, Plaintiff fails to create a genuine issue of material fact as to whether connection to the community was actually a job criterion in the clinical director hiring process.

Plaintiff should have had an opportunity to explore reasonable accommodations to perform the job is entirely beside the point, where Plaintiff cannot satisfy the threshold requirement of demonstrating the relevant work experience and demeanor required for the position.  Taken together, the Court finds that Plaintiff cannot carry her burden of establishing that she was a qualified candidate for the job.  Based on the evidence presented, a jury could not reasonably find in Plaintiff's favor with respect to the clinical director position and the Court will enter summary judgment in CCJ's favor on this claim.

**D.      Issues of Fact Remain as to Whether Plaintiff was "Otherwise Qualified" for the Clinical Therapist Position.**

With respect to the clinical therapist position, the parties dispute whether home visits were an essential function of the job or, in the alternative, whether Plaintiff could perform home visits with reasonable accommodation.  On the present record, the Court finds that CCJ has failed to meet its burden on either question and that issues of fact preclude summary judgment in either parties' favor.

**1.      Essential Function**

As discussed above, a qualified individual under the ADA is a person "who satisfies the requisite skill, experience, education, and other job-related requirements of the employment position that the individual holds or desires and who, with or without reasonable accommodation, can perform the *essential functions* of such position."  29 C.F.R. § 1630.2(m) (emphasis added); <u>see also</u> 42 U.S.C. § 12111(8); <u>Brickers v. Cleveland Bd. of Educ.</u>, 145 F.3d 846, 849-50 (6th Cir. 1998).  The essential functions of

a job are determined on a case-by-case basis.  <u>Hall v. U.S. Postal Service</u>, 857 F.2d 1073,

1078-79 (6th Cir. 1988).  Federal regulations define essential functions as "the

fundamental job duties of the employment position the individual with a disability holds

or desires."  29 C.F.R. § 1630.2(n).  The term "does not include the marginal functions of

the position."  <u>Id.</u>  A function "may be essential because the reason the position exists is

to perform that function" or "because of the limited number of employees available

among whom the performance of that job function can be distributed."  <u>Id.</u>

When assessing what job functions are essential, courts may consider the: (1)

employer's judgment as to which functions are essential; (2) written job descriptions

prepared before advertising or interviewing applicants for the job; (3) amount of time on

the job performing the function; (4) consequences of not requiring the incumbent to

perform the function; (5) terms of a collective bargaining agreement; (6) work experience

of past incumbents in the job; and/or (7) current work experience of incumbents in

similar jobs.  29 C.F.R. § 1630.2(n)(3)(i-vii).  The Sixth Circuit has emphasized that an

employer's job description or its justifications for deeming a particular function essential

are not dispositive.  Rather, the Court must look to the actual functioning and

circumstances of the particular job.  <u>Hall</u>, 857 F.2d at 1079; <u>see also</u> <u>Hoskins v. Oakland</u>

<u>County Sheriff's Dep't</u>, 227 F.3d 719, 726 (6th Cir. 2000).  As explained above, CCJ, as

the employer, bears the burden of proving by a preponderance of the evidence that a

challenged job requirement is essential.

In this case, Plaintiff, without conceding that she could not perform home visits,

argues that home visits are not an essential function of the job.  The record indicates that

the clinical therapist job description did not mention home visits (Pl. Mot. for Summ. J. Ex. 7), little time was spent on home visits by clinical therapists relative to overall direct service hours, though that figure ebbs with the number of DHS referrals at any given time (Rowland Dep. 16:23-17:14), only three out of ten therapists perform home visits currently (Rowland Dep. 19:2-17), at least one therapist who refused to do home visits in the past was accompanied on several initial visits until she became comfortable with the process (Guerriero Dep. 60:11-61:5), work experience of both past therapists and current therapists indicate that, for at least periods of time, therapists were not required to perform home visits (Pl. Resp. to Def.'s Mot. for Summ. J., Ex. 7, Vicki Lewis Decl. at ¶ 7), and, lastly, the testimony of one therapists suggests that at no time since 2006 have all therapists performed home visits (Lewis Decl. at ¶ 13).[11]  CCJ counters that home visits

---

[11]     In response to CCJ's motion for summary judgment, Plaintiff filed two additional declarations from herself and from Vicky Lewis.  Defendant challenges the admissibility of these declarations, arguing that they are submitted in violation of Rule 26(e) and 56(e) of the Federal Rules of Civil Procedure.  The Court finds these objections unavailing.

Rule 26(e) provides that a party who has made a disclosure under Rule 26(a)—for example, in an interrogatory—must supplement or correct its disclosure in a timely manner if the party learns that the disclosure is incomplete or incorrect in some material way.  Fed. R. Civ. P. 26(e).  Rule 56(e) provides that affidavits submitted in support of a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e).  Finally, a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.  Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986).

Here, the Court finds that both Plaintiff's declaration and Vicky Lewis's declaration are admissible.  First, Plaintiff's declaration is timely filed, insofar as it seeks to respond to various statements in other witnesses' depositions about Plaintiff's job qualifications and blindness that were made after Plaintiff's deposition and her answers to interrogatories.  Moreover, Plaintiff's declaration does not contradict Plaintiff's earlier deposition testimony.  Both her declaration and Ms. Lewis's declaration are made on

are essential because they are required of CCJ therapists under the DHS contract. Ms. Guerriero testified that she was seeking job applicants who could fill "a number of different job assignments," including home visits for DHS referrals. (Guerriero Dep. 35:21-25.) Moreover, though the clinical therapist job description did not mention home visits, it contemplated responsibilities not expressly delineated. (Pl. Mot. for Summ. J. Ex. 7.) Finally, testimony from Ms. Guerriero indicated that all therapists, at least at the time she was clinical director, were required to do home visits to handle referrals from DHS. (Guerriero Dep. 60:15-17.)

Given this factual record, the Court concludes that there is a material question of fact as to whether performing home visits is an essential function of the clinical therapist position. There is conflicting testimony on whether *all* therapists were required to do home visits and the consequences of a therapist's refusal to do home visits. There is also conflicting evidence on the nature of the requirements of the DHS contract. Finally, the record indicates that, at least presently, only a small number of therapists among the entire clinic staff actually perform home visits. CCJ has thus failed to carry the burdens of proof and persuasion on the essential function issue.

---

personal knowledge and set out facts that would be admissible in evidence. Finally, although as a general rule, an unsworn affidavit cannot be used to support or oppose a motion for summary judgment, the Sixth Circuit has explained that "a statutory exception to this rule exists which permits an unsworn declaration to substitute for a conventional affidavit if the statement contained in the declaration is made under penalty of perjury, certified as true and correct, dated, and signed. Pollock v. Pollock, 154 F.3d 601, 611 n.20 (6th Cir. 1998) (citing 28 U.S.C. § 1746). See also Williams v. Browman, 981 F.2d 901, 904 (6th Cir. 1992). Both Plaintiff and Ms. Lewis's declarations contain the statement: "I . . . offer this Declaration under oath and subject to the laws of perjury," and both declarations are signed and dated. (Rojek Decl. 1; Lewis Decl. 1.) Accordingly, the Court considers these declarations when deciding the parties' motions.

The Court further notes that there are genuine issues of material fact as to whether sight is essential to safely and competently perform home visits.  Plaintiff testified that she performed home visits in the past, albeit only a few, without incident.  She explained that she can rely on alternative techniques of observation and has good spatial awareness, such that performing home visits is both feasible and safe.  CCJ proffers expert testimony, along with anecdotal testimony from Ms. Guerriero and Ms. Rowland, in support of the assertion that home visits require vision.  However, in light of the fact that none of CCJ's proffered evidence is based on personal knowledge or professional experience with blind therapists, the Court finds that a reasonable trier of fact could find in either party's favor.

### 2.    Reasonable Accommodation

Even if the Court were to conclude that no factual questions exist with respect to whether the ability to perform home visits is an essential function of the job, there is still the question of whether Plaintiff could perform that function if she were reasonably accommodated.  Plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable."  Monette, 90 F.3d at 1183 (emphasis original).  If Plaintiff makes this showing, the burden of proof shifts to CCJ to show that the accommodation would impose an undue hardship.  Id.

A reasonable accommodation may include job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.  42 U.S.C. § 12111(9)(b).  "Job restructuring" within the meaning of the

ADA only pertains to the restructuring of non-essential duties or marginal functions of a job. Bratten v. SSI Services, Inc., 185 F.3d 625, 632 (6th Cir. 1999). Also, "[t]he ADA does not require that an employer exempt a disabled employee from an essential function of the job as an accommodation." Brickers v. Cleveland Bd. of Educ., 145 F.3d 846, 850 (6th Cir. 1998).

Here, Plaintiff does not suggest that CCJ eliminate home visits from the job. Rather, in deposition testimony, she discussed her need for assistive technology to read documents and charts, and the occasional need an assistant to read her documents that cannot be read by a computer. She testified that she relies on personal transportation to get to and from meetings. Specifically with respect to home visits, Plaintiff explained that she would rely on her own experience to perform the visits without assistance. If, however, she suspected abuse or neglect and needed confirmation of visual cues, she testified that she would either call upon her driver at the start or end of a session to alert her to any visual issues or that she could ask a protective service worker to accompany her. Plaintiff argues that these accommodations are objectively reasonable in that they would not disrupt the therapeutic relationship, and she would not require CCJ to hire a special assistant to accompany her on all home visits. Finally, Plaintiff points out that there is evidence in the record to suggest that Ms. Guerriero accompanied at least one therapist, Ms. Lewis, on more than one home visit, when Ms. Lewis reported that she did not feel comfortable performing home visits on her own. The Court finds the proposed accommodations objectively reasonable. The burden thus shifts to CCJ to show that they would impose an undue hardship on the agency.

CCJ argues that the accommodation of having another person present to do a home visit is not a reasonable accommodation, citing Steward v. Daimler Chrysler Corp., 533 F. Supp. 2d 717 (E.D. Mich. 2008) (J. Feikens) and Bratten v. SSI Services, Inc., *supra*. In Steward, a former assembly line worker sued her employer alleging that she was unlawfully laid off because of her disability. Id. at 720. She claimed that carpal tunnel syndrome (pain in her hands, difficulty grasping) and left ulnar neuropathy (shoulder and neck pain) kept her from performing the duties assigned to her on the assembly line. Id. Doctors determined that she could not perform her former job or any other job on the assembly line, because she could not lift more than ten pounds with at least one hand. Id. As an accommodation for this disability, the plaintiff proposed that an assistant be added to the assembly line to assist Plaintiff in her former job. Id. at 722. The court found that this accommodation was tantamount to eliminating an essential function of the job, something the ADA does not require, and that it was thus not a reasonable accomodation. Id.; see also Edwards v. Tacoma Public Schools, No. 06-36006, 2008 WL 1817379, at *1 (9th Cir. Apr. 9, 2008) (teacher's request for full-time assistant was not a "reasonable accommodation" under the Rehabilitation Act where assistant would do "essential functions" of the job).

The Sixth Circuit reached a similar conclusion in Bratten, when it considered whether a disabled automotive mechanic's proposed reasonable accommodation required co-workers to perform as much as 20% of his job's essential duties. 185 F.3d at 632. Where the plaintiff admitted that he was wholly incapable of performing any overhead lifting and like tasks, and that in such cases he required the help of coworkers to assist

27

him on an *ad hoc* basis, the court found the accommodation was unreasonable.  Id.

"[E]mployers are not required to assign existing employees or hire new employees to

perform certain functions or duties of a disabled employee's job which the employee

cannot perform by virtue of his disability."  Id. at 632-33 (citing Cochrum v. Old Ben

Coal Co., 102 F.3d 908, 913 (7th Cir. 1996) (having a helper perform "most if not all" of

roof bolter tasks were "extraordinary," not reasonable accommodations); Benson v.

Northwest Airlines, Inc., 62 F.3d 1108, 1112-13 (8th Cir. 1995); Gilbert v. Frank, 949

F.2d 637, 644 (2d Cir.1991) (employee's requested accommodation of having co-workers

perform essential lifting tasks of job is not "reasonable"); Treadwell v. Alexander, 707

F.2d 473, 478 (11th Cir. 1983)).

        The Court finds Steward and Bratten distinguishable in one important respect.

Plaintiff has not proposed that an assistant accompany her on every home visit, nor that

an assistant take on an essential function of the job.  Rather, she suggests that if she

suspects abuse or neglect, or otherwise has doubts about her ability to assess a situation

without visual observation, she might call on her driver or co-worker to alert her to visual

cues.  By contrast, the situation in Steward and Bratten involved an assistant or co-worker

effectively doing the employee's job on his or her behalf.  Moreover, in this case, because

there are serious questions about whether visual observation is an essential function of

the job and whether home visits more generally are actually required of every clinical

therapist at CCJ, fact questions remain as to whether the proposed accommodation—

occasional assistance in visual observation of a client or home environment—is unduly

burdensome.  Finally, the Court notes that CCJ has not presented evidence that the

occasional reliance on a coworker or Plaintiff's driver would be unduly expensive,

substantial, or disruptive, or if it would fundamentally alter the nature or operation of the

agency.  <u>See</u> 29 C.F.R. § 1630.2(p)(1).[12]  For these reasons, the Court finds that CCJ has

failed to carry its burden of proof on the reasonable accommodation issue and this

question is best left for a jury.

###    3.    Direct Threat

Lastly, as a defense to Plaintiff's claims, CCJ argues that Plaintiff would pose a

"direct threat" to herself and to others and is thus not qualified to perform the duties of a

clinical therapist.  A disabled individual is not "qualified" for a specific employment

position if she poses a "direct threat" to the health or safety of herself or to others which

cannot be eliminated by a reasonable accommodation.  <u>See</u> 42 U.S.C. § 12111(3); <u>Estate</u>

<u>of Mauro By and Through Mauro v. Borgess Medical Center</u>, 137 F.3d 398, 402 (6th Cir.

1998).  Federal regulations define "direct threat" as "a significant risk of substantial harm

to the health or safety of the individual or others that cannot be eliminated or reduced by

reasonable accommodation."  29 C.F.R. § 1630.2(r).

---

[12]  Plaintiff further argues that CCJ failed to participate in good faith in an "interactive
process" to  required under the ADA.  The ADA's regulations indicate that, "[t]o
determine the appropriate reasonable accommodation [for a given employee,] it may be
necessary for the [employer] to initiate an informal, interactive process with the
[employee]." 29 C.F.R. § 1630.2( o)(3). Usually, this duty is triggered by an employee or
prospective employee's request for reasonable accommodation.  <u>See</u> <u>Burns v. Coca-Cola</u>
<u>Enters., Inc.</u>, 222 F.3d 247, 258-59 (6th Cir. 2000); <u>Moore v. Hexacomb Corp.</u>, 670 F.
Supp. 2d 621, 629 (W.D. Mich. 2009).  In this case, because Plaintiff was never granted
an interview for the clinical therapist position, she obviously never had the opportunity to
propose a reasonable accommodation.  The "interactive process" inquiry is therefore
inapposite.

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include: (1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm.

Id. Federal disability law does not require the elimination of *all* risk posed by a person with a disability. Id.; 29 C.F.R. § 1630.15(b).

Here, relying on the testimony of expert witness Dr. Lowder, CCJ argues that homes of substantiated child abusers are located in dangerous neighborhoods and the homes themselves are often in poor condition. Therapists may be subjected to threats of violence and may encounter weapons or dangerous animals. CCJ argues that Plaintiff's inability to see and quickly leave a home poses a substantial risk of harm to herself. Moreover, CCJ argues that Plaintiff's inability to see physical signs of abuse or neglect in children potentially poses a risk to the health and safety of those referred clients. Plaintiff counters with her own testimony that she is generally aware of exits and can make her way out of a space using a white cane. In her declaration, Plaintiff states that houses and apartments are relatively easy to navigate and that, under certain circumstances, she would even be at an advantage to sighted therapists in a home—for example, in the event of a power outage or of a fire. Finally, as a therapist with twenty-six years of experience, she states that she has developed non-visual ways of assessing the likelihood of abuse or neglect.

Although CCJ's arguments present real safety concerns—notably, concerns that apply to *all* therapists doing outreach work—the Court finds that a genuine issue of material fact exists on whether Plaintiff's disability puts her at a substantial risk of significant injury. Plaintiff's testimony raises questions about whether the strategies and techniques she has developed over the course of years of practice as a blind social worker would enable her to sense danger in escalating situations and navigate out of a home. Moreover, because CCJ's expert witnesses have no experience with blind social workers, their testimony hardly establishes as a matter of law that Plaintiff would pose a substantially greater threat to referred clients. As a general matter, the ADA "prohibit[s] employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics." EEOC v. Prevo's Family Mkt., Inc., 135 F.3d 1089, 1097 (6th Cir. 1998). In this case, it appears that CCJ's evidence and rationalization is based at least in part on generalizations about what a blind social worker is or is not capable of. Plaintiff has presented sufficient evidence calling this evidence into question. Under these circumstances, the Court finds that the issue is best reserved for a jury.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary judgment [Docket Entry 31] is GRANTED IN PART, with respect to Plaintiff's claim regarding the clinical director position, and is otherwise DENIED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment

[Docket Entry 32] is DENIED.


Dated: May 27, 2010          s/Gerald E. Rosen_____
                             Chief Judge, United States District Court


I hereby certify that a copy of the foregoing document was served upon counsel of record
on May 27, 2010, by electronic and/or ordinary mail.

                        s/Ruth A.Gunther
                        Case Manager
                          (313) 234-5137